The next case for argument is Gas Sensing Technology Corporation v. Ashton, Docket 18-8089. Mr. Nicholas, please proceed when you're ready. Thank you, Your Honor. Your Honor, I would like to, with my attention, to reserve three minutes if I can. I may use it, but I'm trying not to. Your Honor, with respect to the case before you, my plan is to present to you a short statement of facts. I'll give you the reasons for that and point out some areas in the record. I want to get it on the oral argument with respect to where those places are on the record. And then my plan was to just step through the Honorable Judge Friedenthal's order. In trying to figure out how to take you through the case, I do believe that it's easiest to follow her order. We'll get into the more significant issues by the second issue, but I think your order lays out a way, a pattern to go through this. If it pleases the Court, the general nature of the case is this. Mark Lyon Gas Sensing Technology Corporation is a Laramie, Wyoming corporation. It reached about 80 employees. They have expertise and learned great expertise in developing how to find out where coal bed methane is in the Wyoming coal bed gas seams. They had worked for many years, had great expertise, and they decided to take their expertise to Australia. When they arrive in Australia, they're wildly successful. Their company goes from zero to start to over $35 million of revenue. At that time, it was valued at close to $100 million, one of the fastest-growing companies in the United States for small startup companies. When they arrive in Australia, they do decide that they want to obtain some and secure private venture lending, and they want to do it through a group of people that they've met. They did secure private venture capital input. It's important, Your Honor, to understand that when these folks invested into the capital, GSDC formed a subsidiary called WellDog Pty. It's a wholly-owned subsidiary, so the company GSDC in Wyoming is, in fact, the corporation where equity is invested. They ultimately secured two groups of investments, one on the western side of Australia, and that is Simon Ashton. His company's Pro-X Production Solutions is also related to that, and he has a friend, Campbell Smith, who is a lawyer. They're over on the western side of Australia. On the eastern side of Australia, in Perth, is where WellDog actually set up its offices. WellDog was manned principally by U.S. employees resident in the United States traveling back and forth. In Perth, they approached the Brisbane Angels. The chairman of the Brisbane Angels is John McTaggart, and John McTaggart introduced WellDog to a gentleman named Graham Linklater, who was a member of the Brisbane Angels and also served with them but ultimately was employed to become an employee in the United States, and he moved back and became the CFO of GSDC in the United States. Your Honor, the gist of the case, of course, is that in the first instance, we have Ashton 1 and then we have Ashton 2, and I think you need to have some understanding of how Ashton 1 comes about and why we then have Ashton 2. With respect to Ashton 1, what's happening is that as the company gets great wealth and all of a sudden the venture capitalists all over the world are taking a look at this company, and then you go from the Angel investments and you move into the next set of investors. What we know is beginning in the summer of 2016, WellDog was required to roll over and do some physical changes to their debt structure from the Angel lending. This is expected. It's going to happen routinely. You go from Angels, then you go to the next set of investors, and ultimately you would like to end up with bank investments. Things began getting rough between GST, the parent company, and the shareholders in Australia, and the shareholders in Australia had both debt that they had loaned the money to, and then they had shares that they owned in the company. At some point there is a decision. We know that there has to be some refinancing of a portion of the debt. In the summer, members of the shareholders actually, it's very complicated, and I'm going to apologize because we've now, of course, as you know, tried two cases on this matter this summer, two weeks each. We have 14 days worth of trial in front of Judge Crickin. We have won both of them. Both juries have determined that, in fact, the debts were not properly called, that there is no debt owed by the parent company to the subsidiaries. We know a lot more facts. We have documents that were compelled to be produced this year that are not in the record. We looked at whether we could supplement the record. There's no provision in your rules to supplement the record for documents that you've discovered after the trial. And so we're proceeding forward on the facts that we have, but we have some bias because we know that there's a bunch of facts that are missing before you. What's happening, though, is at the coaxing of the Australians, members of some of the Australian team, GSDC agreed to refinance one of the debts, about $2 million, in exchange for providing a general security agreement over WellDog PTY. They agreed to provide the general security agreement on the promise that the Australians, who are venture capitals, would help them and not interfere with their fundraising. At this time, raising a couple million dollars was not a problem. And everybody has testified that in trials, but more importantly, it was the agreement of the parties that they would participate. The general security agreement is at Appendix Volume 9, page 1014 and 13019. And you're going to see, if you were to look at that, it's signed by Graham Linklater. Graham Linklater at that time had been demoted as the CFO from the U.S. company and was serving as the secretary and a member of the board of directors of the subsidiary responsible still to the parent corporation. He signed it. And then as soon as the general security agreement was signed, there are a series of defaults after defaults after defaults that you will see in the record. And simply not well understood why these defaults were coming from the people that had said, look, if you give us the general security, we will work with you. Instead, default comes after default, and the numbers were astronomical, and you do not have all of them in the record. But we, in any event, we march up to, and the GSTC doesn't know what happened. Then a series of events happened, and on September 21, 2016, the antennas came on, they put on their litigation lock on their computers, and they discover in there an email, which is the September 21, 2016 email described in Appendix Volume 9, page 1028, and it's from Simon Ashton on the western side of Australia to Quentin Morgan and to Graham Linkletter, Graham Linkletter is with John McTaggart on the eastern side of them, and they had this fake press release describing how they were going to reorganize and the Australians were going to end up with the Australian assets. And in fact, because of all the various sequences of default, and what were also happening at this time is these same folks in Australia are sending notices, emails to the U.S. people that are investors, including Shell Technology Ventures out of Texas, shareholders in Texas and Houston, and trying to dissuade the Americans, shareholders, from putting more money in to cure this default. So they're trying to dissuade it. We also know, and I'll point out in the record, that they're also consulting with creditors to try to get them to shorten their trade, I'm intrigued about this lengthy discussion of the historic facts. Most of the rulings below go to other things, dismissal for lack of minimum contacts, dismissal for improper service, dismissal for forum nonconvenience, dismissal for no jurisdiction. Those are the issues, legal issues that are presented. Aren't those the things you should be addressing instead of this long historical fact of how this whole deal came apart? Your Honor, I think I need to get to reach to those and I'll get those as quickly as I can. You've only got five minutes left now. I understand. So I'm going to jump forward, but all of those things are curable defects. All of those things the judge should have allowed us to cure. For example, the service of process. We were serving people with process in Australia. It's more difficult than you might think. We were sending mails. By registered mail, we sent it by regular mail to make sure they were getting the notices. We were in litigation with some of the parties and we had a processor trying to find them. When the first party, which is Kenabalu, appeared to make a dismissal of the case, all the parties appeared and jumped in to ask for the motion dismissed. But we had not accomplished the service. We are still trying to accomplish the service of the parties during this process. When the chief judge made a decision to dismiss the case, including on these issues that we consider that are curable defects, defects that you could cure, there's no determination on the merits. She also, though, made a determination with respect to John McTaggart and with respect to the issue of preclusion and with respect to the form of nonconvenience in saying my prior rulings apply at this time and you should not be suing these people. Out of abundance of cautious, we determined at that time that we absolutely had to stop all the processing. We called the process servers off because if you look at the end of her orders, she also talks about sanctions. While we believe the issue was wrong, we believe at that point we had no business trying to further accomplish the service. We don't think statute of limitations problems exist. But with respect to those— But if you were so concerned about her giving you sanctions, wasn't that kind of poking the bee's nest when you then filed essentially the same suit in the Wyoming State Court? Well, Your Honor, we didn't. It was slightly different. It was slightly different. You dropped WellDog and Pro-X, but the claims were otherwise essentially the same. Well, if you were trying to do a claim preclusion issue, I would agree. With respect to claim preclusion, though, there's no determination on the merits by anyone. And what happens is the court essentially begins an issue preclusion analysis and then jumps to proclaim preclusion. What's the effect of not appealing Ash and Run? We think the effect of not appealing Ash and Run is in those areas where you have basic findings of fact and there were determinations of ultimate fact and conclusions of law based upon that. If you didn't like them, you were required to appeal it right there. And I think when you're analyzing all these cases, you should keep that in mind. And let me give you an example. With respect to Pro-X, it's a basic finding of fact that we had a— there was a contract between WellDog Pty and Pro-X. No question. The interpretation of that then becomes a question of law. When the judge interprets that basic finding, that becomes an ultimate finding and a conclusion of law. That finding is binding forever. And if you look at all the cases on these issues, when you see those cases where there's a contract, the contract was interpreted and it says there's a form selection clause and it says you have to litigate somewhere else. When that decision is made, you now have a contract, basic finding, you have all those facts. So with respect to Pro-X, we agree. With respect to suing Pro-X, there was a contract, a form selection clause, and that was a binding fact. With respect to the balance of the complaint or some analysis, when the judge says, I look at your complaint and I don't think that you probably pled a conspiracy, that's a curable defect. This was a dismissal without prejudice. You can cure those things either then or if more facts become available to you or you learn more, you can cure it at that time and you have the right to refile it. Your Honor, if you look at the record on the— it's a document called International Plan of Restructure. It's the June document that is created by Pitchers Partners. I would like you to take a look at that when you have a chance. It's appendix volume 10, page 1167 and it goes on to 1176. But in there, there's a diagram of their plan, something that we don't discover until well after two years later. And it shows the GSTC. This is what we're going to go after, GSTC. And there's a line through it and then it shows WellDOT PTY. There were two parts to their plan. There was a part of their plan that was directed towards Australian subsidiary. There's another part of the plan that is actually directed towards GSTC that we don't discover later. Now, we suspected that there were similar facts. But the judge never found those facts. In fact, she couldn't because there's been no determination on the merits. She dismissed it without prejudice. There's no findings with respect to the GST component of this case. And when you begin to look at her decision, you won't find the decision with respect to— for example, the statement says you cannot use group pleading. If you look at these emails now that we're able to provide, we see emails among all these parties. They're all in these records at the same time. So you see them emailing to each other. They're developing this plan. They call it a plan. They call it Plan 1. They call it Phase 1. Then they go to Phase 2. So all of this historical facts and probably all disputed, the reason that you're raising that is to show additional facts the district court could have considered in reevaluating the things she had already decided. Is that correct? That's correct with respect. But you have to be careful because when we're talking about the curable defects principle and we're talking about certain curable areas, if that's what you're looking at, the curable defects says you can cure defects for facts that are learned that occur after the event. What we have here are facts that occur but were hidden by the conspirators. We can't get the documents until much later. So they don't become known to us for later. But, Your Honor, if you say, look, if you are unable to plead a case because you don't know what the conspirators say, if somebody from Australia reaches in with the aid of four people, they steal the money out of your checking account, and it's gone. You sue them because the people that you think took at it, and the judge comes to you and tells us what happened. I can't tell you what happened. I think they did it. Well, you haven't brought me enough. I'm going to dismiss it without prejudice. Later, you find facts that existed before your money was stolen. And you say, well, I've now brought to my attention what these are, and I want to refile it because they stole my money, and now this is what I want. We believe under those circumstances you're entitled under issue preclusion to have those facts fined. Remember, with respect to... You need to wrap it up because you're... I can see that. I do need to make some real quick points, and I recognize I'm eating my time. When you look at issue preclusion... No, you're over your time. Oh, I am? That's the negative? You're 18 minutes in. Oh. Could I ask one question? Yeah, please. Could you tell us very succinctly what litigation is continuing in Australia or could be brought in Australia? Your Honor, you didn't hear that. What litigation is occurring now in Australia or could be brought in Australia? There is a single action that's, my understanding in Australia, involving GSDC that has put on stay until this court decides. Okay, thank you. They believe it's a Wyoming case. If you could amend the clock to 18 minutes just so we're fair both ways. Thank you, Your Honor. Good morning. May it please the Court, Maureen Byers on behalf of Simon Ashton, Kenna Ballou, Quentin Morgan, Ewan Meldrum, and while not technically a party to this action, Pro-Ex. Just by way of a preview, I was going to talk about remand and also issue preclusion with respect to the forum non-convenes issue. Could you speak up a little bit, please? I'm sorry. I'm having trouble hearing you. Let me try to be a little bit louder. Is that better? I was going to talk about remand and issue preclusion as it relates to forum non-convenes. However, we haven't talked about remand today, so I might just ask the Court if you have any questions about remand. Otherwise, I'll just go to issue preclusion. Let me just address a couple of questions that you had and a couple of issues that my opposing counsel brought up that I just want to make sure the record is clear. The complaint that was filed in state court did, in fact, include Pro-Ex. Pro-Ex was not a defendant only in the caption and only after the case was removed. When this case was refiled in the United States the second time, it included Pro-Ex only until we removed it. Once it was removed and they realized that they were going to be before the same judge who concluded that there was no personal jurisdiction over Pro-Ex, then they took Pro-Ex out. Pro-Ex was very much a part of the allegations and the claims. In fact, the ninth claim for relief seeks a declaration that the Pro-Ex notes are not in default. To answer your question, yes, it was the same complaint that was filed. In that regard, just so that there isn't any mistake about whether, in fact, this is the same case raising the same issues, I direct the Court to Volume 19, beginning at page 53, where we provide it to the Court for a side-by-side comparison of the two complaints. And you will see that it is every bit the same case. And while they claim that they found new evidence, several things are important about that. First of all, it's not new. The emails are dated before the amended complaint was filed in Ashton 1. The emails are from the summer and the fall of 2016. Their amended complaint was in January of 2017. But is it new to them? In other words, they didn't know about that until after. Well, that's what they say. And we've got to credit that allegation. However, a couple of things. First is, they asked for discovery in Ashton 1 and the judge denied it. Rather than appeal that decision, and on appeal, perhaps a reversal, where they would have gotten more discovery on the conspiracy issue, more information to plead their conspiracy, then that would be the remedy, not to bring a second lawsuit. Secondly, it's the same conspiracy. All of those so-called Jantra emails talk about the same conspiracy that they complained about in the first instance. It's the same case. In fact, Mr. Pope, one of the principals at GSTC, states in his declaration that these emails confirm the existence of a conspiracy. It's the same conspiracy that was pled in the first case. Does it matter the case was dismissed without prejudice? You know, that's something that they had never raised until this morning. It's not raised below, and it's not raised in their brief. They claim today for the first time that, wait a minute, this wasn't a dismissal on the merits, so it's not a final judgment. Well, that's the first time they've raised it, but as a matter of fact it is. Dismissals for the phrase on the merits, as this court has recognized, is a bad phrase because often dismissals are made for personal jurisdiction reasons, foreign non-convenience reasons, several other reasons that are not technically on the merits but are nevertheless final for issue-conclusion purposes. I also want to think they also raised... She said without prejudice, is that right? She did say without prejudice. So when you add that phrase, does that... I mean, does that then make it... Is that a get-out-of-jail card for the guys to repeal then, or refile? Say that again. Does it make it hard? Once a judge specifically says, not just that I'm dismissing on jurisdiction, if that were all your case law, it seems to support you, but when the dismissal goes further and says that it was for jurisdictional reasons and without prejudice, then do you have case law that says that that's a final verdict? For purposes of issue-conclusion, yes. Recall that when Action 1 was decided and she dismissed the case without prejudice, there were two ongoing cases in Australia against the same defendants, about the same Australian subsidiaries, same Australian descendants, same Australian conduct. So if she had dismissed it with prejudice, there would be the argument that they wouldn't be able to proceed in Australia on those same claims. But that's a different... What is your best case that a dismissal that says I'm dismissing on jurisdiction, not merits, and I'm dismissing without prejudice, that that dismissal should be given race judicata effects later? Let me turn the page there. My best case is the one that I cited and I briefed in the court below. And again, this is an issue that was not raised below, it was not challenged below, and it was not challenged on appeal. But in a district court, I cited the case from the Eastern District of Louisiana called Cozumar... Hold it. Eastern District of Louisiana, it's not going to be a very compelling... I know, but it's so perfect. But that is your very best case. Take your second best case... Well, the facts are exactly the same. Give me your second best case... My second best case? ...that is within the Tenth Circuit... How about... ...or is something a bit closer to home? How about Vilar v. Cromley from the Fifth Circuit? Oh, you're inching closer. Can you do any better? Yes, I am. That at least is a circuit case. If you're asking me, is there a Tenth Circuit case that says when you dismiss on foreign non-convenience grounds... Without prejudice. ...without prejudice, that that is a dismissal on the merits for purposes of issue preclusion? There is no Tenth Circuit case that I've ever found. And the only circuit court case is this Fifth Circuit case you're referring to? You're asking for my best ones. I don't know about all of them. Your best ones. Okay, your best ones. And give me that name again, please. Sure. It's Vilar v. Cromley, 990, at 2nd, 1489, Fifth Circuit. Wouldn't a jurisdictional dismissal have to be without prejudice? I beg your pardon? Wouldn't a jurisdictional dismissal have to be without prejudice? Sure, of course. So what is... I'm a little confused about why saying with or without prejudice makes a difference. I don't think it does in this case. I don't think it does. I think for issue preclusion purposes, the dismissal is the dismissal, and it's over. And you don't get a second bite at the apple because, oh, wait a minute, I forgot to appeal that last case, and I found some new evidence in this other case, which, by the way, has nothing to do with my clients. My clients have nothing to do with those no cases where these e-mails were discovered. But in any event, it's not a mission. What if... Well, a little uncomfortable with that. What if, indeed, the party had appealed and had lost the... Appeals Court had affirmed the refusal to allow the discovery, and then six months later, here's a treasure trove of information that was wrongfully withheld and restored? There's no allegation that there's anything wrong... I'm asking a hypothetical. Okay. I'm just trying to see what the boundary of your rule is. What... If I follow your hypothetical, what would happen then is that this plaintiff would have evidence of a conspiracy that it did not have before. But what it doesn't cure is the fact that you have, and in this case, you have ten defendants, seven of whom you don't have personal jurisdiction over. You have the elephant in the room, which is the gigantic debt that's owed to Cro-X that's governed by Australian law that requires resolution by its terms in Australia. So while you may have... I thought I had shut it off. I'm sorry. I know everyone in the back row can hear that. I'm glad it's over. Now that I inappropriately shut it off, I have an inappropriate song. An interest court case handed in Australia. So all is not lost. There is a remedy for all of this and a place for that remedy to be adjudicated. So they should have appealed. That's dispositive. That is dispositive. The fact that he did not appeal... When they didn't appeal, they have lost the ability to complain about any facts which were extant before the decision was made. Absolutely. But they're not without a remedy because they can bring all of that evidence into court in Australia. Those actions are still ongoing? Yes. It has been, as Mr. Nichols has said, it has been stayed for three months. The parties agreed to stay just simply because of this court. But it is ongoing. How is Australia going to be deciding the allegations about a conspiracy that was directed in the United States against United States individuals? The allegation is that they combined in trying to preclude refinancing opportunities in the United States. How is that going to be tried in Australia? Well, Your Honor, that's because that's the argument of counsel but that's not the complaint. The complaint does not argue. If you look at the complaint, it's about the conduct that took place in Australia and the demise of WellDoc, the Australian subsidiary. So the case that you're talking about and the allegations that they make are simply not supported by the record. There are no claims in that complaint, either complaint, that talk about the demise of GSTC. It's all about WellDoc. It's all about wresting control of WellDoc from GSTC. I need to leave time for my co-counsel who represents the balance of the appellees. There are no other questions. Thank you very much. Thank you, Your Honor. My name is Jonathan Franklin and I represent the appellees John McTaggart, John Traholdings, Associated Construction Equipment, which is referred to as ACE, and Brisbane Angels Group, which is referred to as BAG. I'd like to just follow up on some of the questioning that I heard in the prior argument. In terms of the cases, the cases that I would cite to the court would be this court's decisions in Eaton and Park Lake. Both of those decisions hold squarely that a dismissal for lack of jurisdiction can, and in this case, in the circumstances of this case, will be preclusive of that issue in a future case. As Judge O'Brien noted, every jurisdictional dismissal is always without prejudice, whether or not the judge says so in its order. I haven't actually gone back to look at the Eaton and Park Lake decisions to see if the words without prejudice were used, but what that means when it is used is without prejudice to a consideration of the merits of the case. In this case, the dismissals were without prejudice to consideration of the merits of the case, but they were not without prejudice as to the issue that was actually decided. For example, with regard to my client, John McTaggart, in Ashton 1, the district court decided and held that the court lacked personal jurisdiction over him. In analogous circumstances in both Eaton and Park Lake, this court held that that kind of a decision will be preclusive, and that it is preclusive on the issue decided, in that case, the issue being personal jurisdiction. In Park Lake, the issue was ripeness, and in Eaton, the issue was also personal jurisdiction. The new facts will have to be, and Park Lake makes this clear, they have to be facts that post-date. In this case, it would have to be facts that post-dated the dismissal in Ashton 1 and came before the filing of Ashton 2. So, for example, hypothetically, this did not happen, but if my client, Mr. McTaggart, had moved to Wyoming after the dismissal in Ashton 1 and before the filing of Ashton 2, that would be a new jurisdictional fact, but not a situation like this, where the issue was litigated in Ashton 1, it was decided in Ashton 1. Another case I point the honors to is the case of Matsusanto, which is referred to in our brief, and if you look at the last footnote in that case, the court addressed a very similar argument about the lack of jurisdictional discovery in the prior case, or discovery in the prior case, and the court, in that case, said the issue wasn't before it. However, if it were before the court, it would hold that the failure to appeal the lack of discovery in the first case means it's preclusive on the issue in the second case. What we don't want for preclusion purposes is to have multiple continually refilings of cases. You file your case, you litigate your case, you have a fair opportunity to litigate your case, all of which happened in this case, and then you get a decision on the issue. If you don't like that, in this case, the remedy would have been to appeal to this court the issues in Ashton 1, including the denial of jurisdictional discovery. They did not do that. What they can't do is then file a new, duplicative case that flies in the face of the judge's earlier ruling as to both form of nonconvenience and personal jurisdiction. This case is ongoing in Australia. It can be tried. The issues can be tried in Australia. The court lacks jurisdiction. And just one point I'd like to make. There were some statements in the earlier argument about service of process. There is no mention of service of process issues in the opening brief or the reply brief. That issue has been waived. I would note, having also said that it's been waived, they were presented, the other side was presented, at the very outset of the case, with the assertion in a motion that service of process was improper. They never contested that it was improper, and they never took steps between the filing of the insufficient service and the dismissal to correct that defect. And then they don't argue it on appeal. I think that issue is completely beyond this court. How many of these defendants were dismissed because of the procedural inadequacy of the process of service of process? Three of them, Your Honor. Two of my clients, A.C.E. and Jontra, and I believe Mr. Meldrum, was the other one on service of process. And they never contested that. A.C.E., Jontra, and Meldrum? I believe it's Meldrum, correct, yes. Meldrum and A.C.E. and Jontra were dismissed on service of process. Those dismissals were never appealed to this court. There's nothing in the opening brief. There's nothing in the reply brief. The first we've heard about it is in the opening argument in this court, and that's too late. And they did have an opportunity, a full and fair opportunity for many, many months to correct what they knew, and frankly, I think with regard to Meldrum, admitted were defects in service. They didn't do it. So for all of those reasons, we would ask that the court affirm all of the dismissals. This case was largely decided in Ashton 1. The remedy, if they had a problem with that, would have been to appeal that decision to this court, not to file a new case and try to appeal it a second time around. Thanks, Your Honor. Thank you, counsel, for your arguments. The case is submitted.